☑ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Records and information associated with the cellular device assigned 414-510-8500

Case No.25-842M(NJ)

Matter No. 2025R00071

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ______ District of ______
*(identify the person or describe the property to be searched and give its location)*:

see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 3/21/2025 *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Honorable Nancy Joseph.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of ______.

Date and time issued: 3/7/2025 10:09 a.m.

Nancy Joseph
*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Court
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ______________________

______________________________
*Executing officer's signature*

______________________________
*Printed name and title*

# ATTACHMENT A

## Matter No. 2025R00071

Records and information associated with the cellular device assigned call 414-510-8500 ("Target Cell Phone"), whose service provider is AT&T (the "Provider" or "Service Provider"), and whose suspected user is Juwon Jacquez MADLOCK.

**ATTACHMENT B**
**Matter No. 2025R00071**

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with Target Cell Phone for the time period February 1, 2022, to the date of this warrant:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

   viii. Means and source of payment for such service (including any credit card or bank account number) and billing records**;** and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by Target Cell Phone, including:

(i) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received); and

(iii) timing advance data (PCMD, RTT, True Call, Timing Advance, LOCDBOR, or equivalent).

b. Information associated with each communication to and from Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with Target Cell Phone.

c. Information about the location of Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, per call measurement data (PCMD), Timing Advance, True Call, RTT, LOCDBOR, or similar and real time cell site information for 30 days and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and

with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitute evidence of violations of 18 U.S.C. §§ 4 (misprision), 922(d) (transferring ammunition to a felon), 922(g) (possession of a firearm by a felon), 922(o) (possession of a machinegun), 1512(c)(2) (obstruction), and 2315 (sale or receipt of stolen goods).

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, ________________________________, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by ____________________ ("Provider") and my title is ____________________________. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Provider. The attached records consist of ______________________________________ (*generally describe records in terms of pages, CDs or megabytes of data*). I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Provider, and they were made by Provider as a regular practice; and

b. such records were generated by Provider's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Provider in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Provider, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

______________________________ ______________________________________

Date Signature

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Records and information associated with the cellular device assigned 414-510-8500

Case No.25-842M(NJ)

Matter No. 2025R00071

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

see Attachment A,

located in the ________ District of ________, there is now concealed *(identify the person or describe the property to be seized)*:

see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 4, 922(d), 922(g), 922(o), 1512, 2315 | misprision; transferring ammunition to a felon; possession of a firearm by a felon; possession of a machinegun; obstruction; sale or receipt of stolen goods |

The application is based on these facts:

see attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ______ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jacob Dettmering, FBI SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 3/7/2025

*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Court

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**
**Matter No. 2025R00071**

I, Jacob Dettmering, being first duly sworn, hereby depose and state as follows:

## I. BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location data (described more fully in Attachment B) associated of the cellular telephone assigned call number 414-510-8500, believed to be used Juwon Jacquez MADLOCK, DOB 02/14/1996, and serviced by AT&T ("Target Cell Phone").

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since January 7, 2018. I was assigned to the FBI Capital Area Gang Task Force (CAGTF) in Baton Rouge, Louisiana from June 15, 2018, to April 1, 2020. Since April 1, 2020, I have been assigned as the Task Force Coordinator for the Milwaukee Area Safe Streets Task Force (MASSTF). Since 2018, I have investigated violations of federal law, directed drug and street gang investigations, obtained and executed search and arrest warrants related to the distribution of illegal narcotics, and debriefed confidential informants and cooperating defendants. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal offenses.

3. I have been trained in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. I have participated in criminal investigations, surveillance, search warrants, interviews, and debriefs of arrested subjects. As a result of this training and investigative experience, I have learned how and why violent actors typically conduct various aspects of their criminal activities.

4. This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

5. Because this warrant application seeks, among other things, the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the Target Cell Phone.

6. There is probable cause to believe that MADLOCK is using the Target Cell Phone, given the evidence described in more detail below. The number has remained in service since 2009 and Investigators believe MADLOCK to still be the user of the device. I know from training and experience that cell phone users normally have their cell telephones with them, so locating a user's cell phone will show that user's location. I believe that locating the Target Cell Phone, and reviewing the contents of the Target Cell Phone, will constitute and lead to evidence of federal offenses, namely the Target Offenses defined below.

## II. PROBABLE CAUSE: Summary

7. The Federal Bureau of Investigation and its law enforcement partners were

conducting a criminal investigation of Cobie HANNAH regarding, *inter alia*, firearm offenses. As part of that investigation, they reviewed, pursuant to a state search warrant, HANNAH'S electronic devices. That review uncovered text messages between HANNAH and Milwaukee Police Officer Juwon Jacquez MADLOCK. Those text messages, described in more detail below, reflected criminal misconduct by MADLOCK. Law enforcement submits it has probable cause search HANNAH's electronic devices for evidence of additional crimes, and to review electronic location data associated with MADLOCK's phone, as part of its investigation into violations of 18 U.S.C. §§ 4 (misprision), 922(d) (transferring ammunition to a felon), 922(g) (possession of a firearm by a felon), 922(o) (possession of a machinegun), 1512(c)(2) (obstruction), and 2315 (sale or receipt of stolen goods) ("Target Offenses").

## III. PROBABLE CAUSE: Expanded

8. The "BZF," also known as the "Burleigh Zoo Family", is a violent street gang in Milwaukee, that engaged in various criminal activities, including crimes of violence, illegal firearms possession, drug distribution, conspiracy, and fraud, in Milwaukee and elsewhere. Law enforcement knows HANNAH is a member of the BZF because, *inter alia*, they recovered BZF-inscribed items during a search warrant at HANNAH's residence, described more fully below.

9. On Thursday, February 13, 2025, at approximately 6:35am, members of the Milwaukee Police Department's Special Investigations Division and Federally Deputized Task Force Officers of the Federal Bureau of Investigation's Milwaukee Area Safes Streets Task Force, in conjunction with the Milwaukee Police Department's Tactical Enforcement Unit, executed a judicially authorized residential search warrant at 4240 S. Ravinia Dr #202, in the City of Greenfield, Milwaukee County.

10. The target of the warrant was Cobie D HANNAH Jr (B/M 03/20/1995), who was

wanted by the Milwaukee County Sheriff's Office for Milwaukee County Case #2020CF002754 (State of Wisconsin Warrant #2022005705 - dated 07/18/2022), in which HANNAH was on bail and released with a court order to have no dangerous weapons or firearms. Additionally, HANNAH was previously convicted of a felony in this case on February 1, 2022, and advised that as a result of this conviction, he is prohibited from the possession of firearms.

11. Upon knocking at the door of the residence, police received no response and made entry into the residence, where HANNAH was ultimately located and taken into custody regarding his open warrant. The residence was then turned over to members of the Special Investigations Division to conduct a search of the residence pursuant to the search warrant.

12. From within the residence, investigators located and recovered multiple identifiers showing HANNAH controlled the premises, including utility bills and other documents addressed to HANNAH at this location. Furthermore, investigators located and recovered a Century Arms model VSKA AK47 style 7.62x39 rifle-caliber "pistol" (Ser# SV7P012440), which was loaded with a cartridge in the chamber and a loaded magazine from within the northeast bedroom.

13. Additionally, investigators located and recovered two Glock firearm boxes, one of which was labeled for a Glock model 20, 10mm handgun and one unlabeled, as well as a loaded magazine for an AR15 style firearm.

14. Furthermore, investigators located a key fob and a garage door opener in a jacket that was provided to HANNAH prior to transport. A search of this garage revealed a stolen 2020 Jeep Grand Cherokee (VIN # 1C4RJFBG0LC427425), which was reported stolen in Hammond, Indiana under Case #24H40099 and a date of theft 06/17/2024. Within this Jeep and on the floor surrounding this vehicle were multiple registration plates, 2 of which were for different Jeep vehicles, 1 set which listed to HANNAH, and a set of 2 paper dealer placards with a plate bracket

from Hammond, IN. It should be noted that during this investigation, publicly viewable social media related to HANNAH was located, which depicted HANNAH being in Indiana on or about June 22, 2024. Based upon this time frame and HANNAH's possession of the original paper placards affixed to the stolen auto and multiple false registration plates, it is believed that HANNAH knew that this vehicle was a stolen auto and utilized this registration to evade law enforcement detection.

15. During the course of this investigation, affiant and other investigators learned of digital media that was captured between 03/20/2023 and 12/19/2024 that depicts HANNAH in the 3100 block of N 25th St with a suspected firearm concealed beneath his shirt.

16. During the course of this same warrant at HANNAH'S residence, multiple electronic media storage devices were recovered, including a black iPhone with cracked screen and black case as Item #1, a black iPhone with cracked back as Item #2, a black Sonim flip phone as Item #3, a black iPhone with cracked screen in clear Givenchy case as Item #4, a white HP laptop as Item #5, and a red iPhone with black case as Item #6, that these items belong to Cobie D HANNAH Jr (B/M 03/20/1995), on Milwaukee Police Department Inventory 25003812 as Items 1-6 (previously defined, with their extractions, as the Subject Devices).

17. Based on the digital media observations described above and the evidence recovered at HANNAH's residence, investigators obtained a state search warrant authorizing them to extract and review the Subject Devices. On or about February 17, 2025, Investigators reviewed the download of a black iPhone with cracked screen and black case, herein referred to as Item #1. Item #1 was located in HANNAH's possession at the time the Milwaukee Police Department Tactical Enforcement Unit made contact with him in the living room of the residence during the execution of the search warrant.

18. During the review of Item #1, Investigators discovered a text message thread between HANNAH and 414-510-8500, which was saved in that device under the contact name of "Wuan." Investigators, utilizing law enforcement and open-source databases, identified the owner of the phone number 414-510-8500 as Juwon Jacquez MADLOCK, DOB 02/14/1996, with a home address of 3406 N 37th Street, Milwaukee, WI. The service provider of that device is AT&T, per databases that have proven reliable in the past. MADLOCK is a City of Milwaukee Police Officer currently assigned to District 6, located at 3006 S 27th Street, Milwaukee, WI, which covers the southwest side of the City of Milwaukee. Prior to being assigned to District 6, MADLOCK was assigned to District 7, which is located at 3626 W Fond Du Lac Ave, Milwaukee, WI, which covers the northside of the City of Milwaukee.

19. Over the course of this text thread between HANNAH and Officer MADLOCK, the two engage in discussions that are alternatively benign (for example, regarding the buying and selling of dogs) and criminal in nature. The latter include, by way of summary:

- HANNAH and Officer MADLOCK discussing HANNAH's suspicions about which persons might be cooperating with law enforcement;
- HANNAH and Officer MADLOCK discussing the possibility that "the feds" may be involved in certain investigations;
- Officer MADLOCK offering to provide HANNAH with ammunition;
- Officer MADLOCK offering to let HANNAH use one of his firearms;
- Officer MADLOCK providing HANNAH with addresses associated with suspected rivals of HANNAH and the BZF;
- Officer MADLOCK and HANNAH discussing the exchange of fake identification cards and fraudulent license plates;

- Office MADLOCK and HANNAH discussing the sale of stolen vehicles; and,
- Officer MADLOCK identifying, to HANNAH, specific members of the Milwaukee Police Department engaged in various enforcement actions.

20. Examples of probative conversations follow below. These conversations are not, in every instance, precise quotations. Some messages have been omitted or modified for clarity. Beneath the messages, I offer law enforcement's interpretation of the respective conversations, based on their training, experience, and knowledge of the investigation to date.

21. On or about February 13, 2024, HANNAH and MADLOCK had the following text conversation:

- MADLOCK: Wtw bro
- HANNAH: Rudy went to work
- MADLOCK: **Three laughing emojis**
- HANNAH: I need him wit me lowkey
- HANNAH: He thought I was bullshittin
- HANNAH: He work at the Amazon
- MADLOCK: Nigga went to work ??? He can't make 20k in less than an hour in that mf
- HANNAH: I told him !
- HANNAH: I ain't really say too many details I just said 70k that's it
- MADLOCK: Man ian gone lie im damn near bouta just go in that mf
- HANNAH: Say stg lol
- HANNAH: Man take me with you shit if you gone go in
- MADLOCK: stg bro
- HANNAH: You off ? Or on break ?
- MADLOCK: I'm off at 12
- MADLOCK: What's your address bro
- MADLOCK: I deleted our shit
- MADLOCK: Can still there… Van still there
- HANNAH: On what I just got up ima see if bro found another car
- MADLOCK: Lmk
- MADLOCK: What you tryna do bro?
- HANNAH: Wats the word
- HANNAH: U got a different (car emoji)

22. Investigators believe that the above captioned conversation concerns a potential

vehicle theft. The two talk about going somewhere, presumed to be a residence or garage, and discuss making an easy $70,000. Furthermore, they talk about having a "different" vehicle to use, which would be a way of separating themselves from the vehicle theft. Additionally, Investigators found a conversation thread between HANNAH and "Rudy", whose phone number was 414-435-4054. That conversation occurred during the same time period as the above conversation with MADLOCK and gives more context to the conversation between HANNAH and MADLOCK and is referenced below.

- HANNAH: Broooooooooooo
- HANNAH: !!!!!!
- RUDY: What Happened
- HANNAH: Omg
- HANNAH: **Money Bag Emoji**
- RUDY: GTA?
- HANNAH: Answer the phone you might gotta call in stg !!
- RUDY: iight
- HANNAH: I'm getting the details !
- RUDY: iight
- HANNAH: 70k
- HANNAH: He ain't hit me back yet
- HANNAH: Tryna wait and see wat up
- RUDY: iight
- HANNAH: He said he still at work and call him tomorrow morning
- RUDY: iight bet
- HANNAH: ***Sends a screenshot of conversation between HANNAH and MADLOCK***
- RUDY: Bet I'm off at 4 ina Be Up Too
- HANNAH: Shit ima be up waiting lol
- RUDY: **Crying laughing emoji**
- RUDY: On god
- RUDY: Come get me like 8
- HANNAH: Man U dnt be up
- RUDY: Yea I do
- HANNAH: We gone see
- RUDY: iight
- HANNAH: Wait he txting now

23. On or about March 10, 2024, HANNAH and MADLOCK had the following text

conversation:

- MADLOCK: Stay off 27
- MADLOCK: Or below on south
- HANNAH: I'm in the crib
- HANNAH: wat happen doe
- MADLOCK: Bet
- HANNAH: The busting shit down ?
- MADLOCK: Yeah they got sheriff greenfield and mpd out
- HANNAH: Say less

24. Investigators know that the Milwaukee Police Department regularly implements a Violent Crime Action Plan, also known as VCAP. VCAP includes assigning extra patrol to certain areas of the city and bringing in outside jurisdictions to conduct traffic stops on reckless drivers, mobile drug dealers and other violent individuals. Investigators believe that a VCAP was being conducted on the day of the above text message exchange between HANNAH and MADLOCK, and this conversation reflets MADLOCK warning HANNAH about the same, because MADLOCK knew HANNAH was wanted.

25. On or about March 22, 2024, HANNAH and MADLOCK had the following text conversation:

- HANNAH: Yoo
- MADLOCK: Yo
- HANNAH: I'm back I need you to check plate for me
- HANNAH: You at work ?
- MADLOCK: I go back tomorrow
- HANNAH: Okay bet
- HANNAH: **Sends a photo of a white Alfa Romero with the Wisconsin license plate AVJ-3248**
- HANNAH: Was they still valid ?
- MADLOCK: Yeah they still good until April bro. Gotta wait until April up so he can go renew them
- MADLOCK: After April*
- HANNAH: Ok
- MADLOCK: If he don't renew them I'll get you a new set or renew them myself.
- MADLOCK: As long as he don't need admissions we good to renew online if he don't

- HANNAH: Hopefully he do doe
- MADLOCK: Yeah if not you know we gone make it happen
- HANNAH: Cus his shit so valid they get rite off me every time
- MADLOCK: (Laughing emoji and flexing emoji)
- MADLOCK: They don't wanna fuck with a veteran
- HANNAH: Bro I'm talking bout they get tf back !!!! (Laughing emoji)
- HANNAH: Ask Rudy
- MADLOCK: (Laughing emoji) yeah that shit pop right up as soon as they run it

26. Through other investigations, Investigators know that HANNAH had a white Alfa Romero car. That car was stolen, though officers did not originally identify it was such because it had a replacement VIN. Investigators believe that MADLOCK assists HANNAH with ensuring he has good license plates for his stolen vehicles, and the above conversation is an example of the same.

27. On or about March 29, 2024, HANNAH and MADLOCK had the following text conversation:

- HANNAH: District 7 caught one of my guys today
- HANNAH: Switch, drac, dope
- MADLOCK: Damn who?
- HANNAH: My nigga Jake
- HANNAH: Bro we salty
- MADLOCK: What's that nigga real name ?
- HANNAH: I gotta get it bro
- MADLOCK: Or what time it happen
- HANNAH: 2 o'clock
- HANNAH: Traffic stop Sherman Burleigh
- HANNAH: This nigga should of smashed he was on the phone with us whole time
- MADLOCK: Nigga pulled over with al that ?
- HANNAH: Dummy bro !!!
- HANNAH: We on the phone saying smash
- MADLOCK: That nigga asked for it. Switch??? Nigga that's automatic fed
- MADLOCK: That alone worry (worth) the speed
- HANNAH: Plus he on probation
- MADLOCK: This who arrested yo guy (MADLOCK provided a picture of Police Officer V.Y.)
- MADLOCK: He got caught by a sassy nigga he definitely could've took them on one
- HANNAH: SMH

- HANNAH: Pure bitch
- HANNAH: You see it on the computer?
- MADLOCK: Naw I asked around cuz im in 6 now not 7
- HANNAH: Aw damn
- HANNAH: Bro real name Austin
- HANNAH: And they raided his girl house this morning.
- MADLOCK: That nigga cooked. Unless he bail out after they lift his hold and he run
- HANNAH: He on papers
- MADLOCK: Yeah that's why I said when they lift his hold. Doc will probably lift it after his initial court appearance.
- HANNAH: I doubt it
- HANNAH: He got caught with that shit
- HANNAH: And he been to prison before
- MADLOCK: Shit chicken was on paper and hold too
- MADLOCK: Trust me they gone eventually lift that shit
- MADLOCK: Might be a few months but they will
- HANNAH: Man idk wats goin through that nigga head
- HANNAH: Shit he shouldn't never stopped
- MADLOCK: Exactly nigga dumb

28. Investigators searched the date and incident in question and discovered that the two are discussing Aston BROWN, reference Milwaukee County case number 2024CF001527. BROWN was charged with five felonies, including possession of a machine gun, felon in possession of a firearm and possession of fentanyl and Cocaine. Those charges seemingly correspond to facts discussed in the above communications. Furthermore, during the communication, MADLOCK provided the identity of the arresting officer. HANNAH also told MADLOCK that BROWN should have taken the police on a chase and alluded to having BROWN go on the run when he bonds out of jail.

29. On or about April 9, 2024, HANNAH and MADLOCK had the following text conversation:

- HANNAH: Yooo
- HANNAH: You got some for sell
- MADLOCK: Got some what?
- HANNAH: (Firework Emoji) [believed to reference firearms]

- MADLOCK: Shit what you looking for
- HANNAH: (Hotdog emoji) [believed to reference a "glizzy," which in turn is a street name for a Glock]
- MADLOCK: 2 ks and a scorpion
- HANNAH: No Glock ?
- MADLOCK: (sends picture of a full-size AK-47 style rifle on back of brown leather couch)
- MADLOCK: (sends picture of a mini Draco)
- MADLOCK: And another black k 762
- HANNAH: Need some hand ones
- HANNAH: Need some hand ones Glocks

30. Investigators believe that the conversation above was HANNAH asking MADLOCK to sell him some firearms. HANNAH specifically wanted some Glock handguns. MADLOCK sent pictures of high-capacity rifles that he would sell but said he had no pistols.

31. On or about April 14, 2024, HANNAH and MADLOCK had the following text conversation:

- MADLOCK: Aye bro im bouta update yo plates. It's 100 to do it
- MADLOCK: Otherwise they expire on the 30th
- HANNAH: Do it I got the 100 in cash or I can give it to you tomorrow
- HANNAH: Do it I got the 100 in cash or I send it to you tomorrow
- HANNAH: You dnt think dude gone update them doe his self ?
- MADLOCK: He updated his
- MADLOCK: But it's two plates coming back to the same car
- HANNAH: Damn can he see that ?
- MADLOCK: Is how I did it. I Ain't know if it was gone update yours
- MADLOCK: It didn't
- MADLOCK: And naw he can't. He can only see the plates he got. Remember I put All different information in for yours
- HANNAH: Aw ok ok well shit I got it
- MADLOCK: Bet. And whenever the sticker come I'll bring it if you come grab it.
- MADLOCK: The Cash app $JayJayMadlock . I'm bouta do it now.
- HANNAH: Ok shit you know the money good wit me

32. Investigators believe that this conversation reflects MADLOCK registering and obtaining license plates for HANNAH. It is believed that MADLOCK is using Police databases to identify identical vehicles and get plates to put on HANNAH's stolen vehicles. This would

make it appear to law enforcement on the street that the vehicle is current and registered.

33. On or about April 28, 2024, HANNAH and MADLOCK had the following text conversation:

- HANNAH: You got any 9 shells on hand
- MADLOCK: Yeah I do how many you need
- MADLOCK: 9mm right
- HANNAH: Yep
- MADLOCK: Yea
- HANNAH: 2 boxes
- HANNAH: You got some 10mm too ?
- HANNAH: Need some of them too
- MADLOCK: Nope no 10mm
- HANNAH: How much for them 2 boxes
- MADLOCK: Ion know how many it is but I got a bunch in my car door of the 9s
- HANNAH: Shit these mfs got sticks on them
- HANNAH: It's 2
- MADLOCK: How many in they mag
- MADLOCK: Imma go see rq
- HANNAH: Just need like 30
- HANNAH: You gotta extra 9 clip
- MADLOCK: I got 31 in my car. My boxes at the crib I'm working til 6am
- HANNAH: How much for them
- MADLOCK: Shit bro it's loose ammo ion care about that shit. You can have em
- HANNAH: Aw damn way lol
- MADLOCK: D6
- MADLOCK: I'm inside. I won't be mobile till 12
- HANNAH: So how you wanna do it
- MADLOCK: I can run em out tho if you pull into the parking lot. Shit that's if you want to tho

34. Investigators believe that this conversation reflects MADLOCK agreeing to provide HANNAH with ammunition. Per the remainder of the conversation, it appeared that HANNAH never showed up to the Police Department to pick up the ammunition, but they discussed attempting to meet the following day so HANNAH could get the ammunition.

35. On or about April 30, 2024, HANNAH and MADLOCK had the following text conversation:

- MADLOCK: What cars yo people got rn?
- MADLOCK: I got 5 for something
- HANNAH: I ain't even talk to him in a minute I'm finna text and ask him
- MADLOCK: Ok bet lmk
- HANNAH: He said just a lex truck
- HANNAH: And a fin
- MADLOCK: What type of lex truck
- MADLOCK: No Fins
- HANNAH: Just asked him
- HANNAH: (Sends a picture of a new model gray Lexus SUV)
- MADLOCK: Oh an older one what they want for it ? And they don't got nun better than that?
- HANNAH: 2021
- HANNAH: He said they just sold everything that's wats left
- HANNAH: And $3000 for that
- HANNAH: I'll ride that mf I ain't gone lie shit lol
- MADLOCK: Oh okay. I need something fast. Cat rs m series
- MADLOCK: And I got plates for a gray one already actually lmao

36. Investigators believe that this conversation reflects MADLOCK attempting to buy a stolen vehicle for $5,000. The vehicle that HANNAH was offering him was a 2021 Lexus SUV which retails for over $30,000. If the vehicle is being sold for $3,000 (the relayed price), it is evident that the vehicle was likely stolen. Additionally, MADLOCK, as a Police Officer, would know that price would be consistent with a stolen vehicle. Lastly, MADLOCK stated he already had a plate which would match with a gray Lexus SUV, which was likely fraudulent.

37. On or about May 1, 2024, HANNAH and MADLOCK had the following text conversation:

- HANNAH: You still got them (Squirt gun emoji) for sell?
- HANNAH: I damn near kno somebody who want them
- MADLOCK: The ones I sent you?
- HANNAH: Yea
- MADLOCK: Shit if they want them they can get em but they ain't cheap (laughing emoji)
- HANNAH: Lol how much
- HANNAH: (sends picture of firearm)
- MADLOCK: Depending on which one you talking about. 800 for the top a g for the bottom

- HANNAH: wat is the top
- MADLOCK: The drac
- MADLOCK: Both never been shot
- HANNAH: Aw he said he need hand (squirt gun emoji)
- HANNAH: He said he got big shit already
- HANNAH: He said it's all bad ?
- MADLOCK: On the hands damn near I wanna keep all them. I can get him a fn 5.7 for 8 tho
- HANNAH: Send pics
- MADLOCK: (Sends picture of FN 5.7 pistols from internet search)
- HANNAH: Naw I'm saying you ain't got it on hand ?
- MADLOCK: I can grab it if he want it. It ain't mine.
- MADLOCK: My brother was selling his
- HANNAH: They just found some glocks
- HANNAH: You already know wat they tryna do wit them
- MADLOCK: They need em or got that figured out already
- HANNAH: Already got them
- MADLOCK: The other thing
- HANNAH: Yeah they got them
- HANNAH: mfs got them out here for $100 now
- MADLOCK: Ok bet bet
- HANNAH: Metal

38. Investigators believe that this conversation reflects HANNAH attempting to purchase Glock firearms from MADLOCK. Investigators further believe that the firearms need to be Glocks because they intend to affix machine gun conversion devices on them, which usually only work on Glocks. MADLOCK then asks if the would-be Glock purchasers need any conversion devices, and HANNAH responds in the negative, indicating the customers already have conversion devices, for which they paid $100 (which is a typical street price for a metal machine gun conversion device).

39. On or about May 9, 2024, MADLOCK and HANNAH have the following text conversation:

- MADLOCK: You got a shell catcher ?
- HANNAH: Nope
- MADLOCK: You gotta grab you one
- MADLOCK: They only like 20-30

- HANNAH: Damn on wat Ima grab one
- HANNAH: ima tell Rudy too
- MADLOCK: Amazon
- MADLOCK: I just got one
- HANNAH: Bet
- MADLOCK: (Sent a photo of himself holding a Draco rifle with a shell catcher affixed)
- HANNAH: Sell it
- HANNAH: Shit
- MADLOCK: Told you I got something shit (laughing emoji)
- HANNAH: Yo ass finna go to war over there

40. Investigators know that (i) firearms can often be linked to shootings via the particular markings on spent ammunition casings found at the scene; and (ii) "shell catchers" are devices affixed to firearms that "catch" spent ammunition casings, thereby preventing shooters from leaving incriminating casings on-scene for law enforcement to recover. Law enforcement believes that this conversation reflects MADLOCK telling HANNAH about a shell catcher because he knows that HANNAH is involved in unlawful shootings and having a shell catcher affixed to his weapon would help HANNAH ensure that there are no shell casings for the Police to utilize.

41. On or about June 1, 2024, HANNAH and MADLOCK have the following text conversation:

- HANNAH: Do forgot to tell you why we was at the candle light yesterday why district 7 came up there so fast !
- HANNAH: The ones on my case !
- MADLOCK: Stg ? What they do ?
- HANNAH: We got up out there I had a mask on I seen the black dude his bitch ass
- HANNAH: Bro they was coming wit they lights on all type of shit like 10 cars
- MADLOCK: (Provided a picture from Facebook for S.M.)
- MADLOCK: This nigga [is the officer]?
- HANNAH: Yes bro !
- HANNAH: That's him !
- HANNAH: They damn near came looking for me bro that;s the same way they came wen they caught me the first time same officers and everything
- MADLOCK: Where did yall have it at? I'll look and see if somebody called it in

- HANNAH: I dnt think it was a call
- HANNAH: I think they just got word I only say that cus the sheriff was there chilling it was the district who came on bullshit
- HANNAH: Sherman park rite by 40th you know they was looking for the dog man [meaning himself] lol I got up out there on they ass
- MADLOCK: (Laughing emoji) shit crazy I know they ass was salty they couldn't find shit
- HANNAH: Nigga we ran smash off all type of shit lol
- HANNAH: My stomach was in my ass wen I see dude lucky I had the mask on (laughing emojis)
- HANNAH: Jump in the car and did 80 ! Took my ass home lol
- MADLOCK: (Laughing emoji) I told you if you ever get in a speed get on that highway and just keep going
- MADLOCK: They gotta cancel it
- HANNAH: Say less !!
- HANNAH: They ain't chase nobody it was too many ppl pulling off and running at once
- MADLOCK: You ain't got no (Bowling ball and pins emoji) [believed to be a reference to a "striker," which in turn is a street name for a stolen vehicle] around? I need one to do sumn
- MADLOCK: Let me use it and I let you use the p80 (Laughing emoji)
- HANNAH: Nope lol
- HANNAH: You cold for the emoji (laughing emojis)
- MADLOCK: (Laughing emojis) man

42. Investigators know that HANNAH had an open case from August 2020 (2020CF002754), which was the source of a bench warrant for HANNAH on July 18, 2022. At the time of the incident discussed above, HANNAH was a wanted fugitive. During this conversation, MADLOCK was instructing HANNAH in how to avoid capture during a Police pursuit. At the end of the conversation, Investigators believe that MADLOCK asked HANNAH if he had any stolen vehicles MADLOCK might use.

43. On or about June 17, 2024, HANNAH and MADLOCK had the following text conversation.

- HANNAH: Brooooooo
- HANNAH: 911
- MADLOCK: Yo
- MADLOCK: What's going on

- HANNAH: Bro Police just hit us
- HANNAH: They got the cars and all the guns
- HANNAH: 13th Burleigh
- HANNAH: We got away
- MADLOCK: Yo Alfa too?
- HANNAH: Yes
- MADLOCK: Damn wtf
- MADLOCK: Way" You good?
- HANNAH: Bro idk wtf goin on
- MADLOCK: Somebody called the Police on y'all
- MADLOCK: Subjs flashing guns, veh being towed.. 2 firearms and weed recovered (nobody in custody)
- MADLOCK: This is what somebody just texted me
- HANNAH: SMH
- HANNAH: That's the 10 and my guy drac
- HANNAH: Out the cars but my guy whoever over there said they just found more guns in the yard
- MADLOCK: They ran yo vin and it came back stolen that's why they popped yo locks.
- MADLOCK: If you had yo vin covered they wouldn't be able to
- HANNAH: (Head shake emoji)
- MADLOCK: They towed it ?
- HANNAH: Yep 1 by 1
- MADLOCK: Yo shit too?
- HANNAH: They waiting on more tow trucks
- MADLOCK: Damn when I go back imma let you know who called it in
- HANNAH: Shit crazy I just took big L
- HANNAH: Can you call me real quick
- MADLOCK: (sends a screenshot of the City of Milwaukee Tow Lot)
- MADLOCK: Imma look it up I go back Tuesday
- HANNAH: Bro I'm salty
- HANNAH: You think they finna try to look for me ?
- MADLOCK: You ain't have nothing in there with yo name on it did you?
- HANNAH: Nope nothing
- HANNAH: Nun at all
- HANNAH: I'm talking bout my fingerprints
- HANNAH: All infinity's hot ?
- MADLOCK: Yea bro all them mfs hot
- MADLOCK: If you get one make sure it's a S
- MADLOCK: 3.0
- MADLOCK: So you can at least get away

44. Investigators believe that this conversation reflects HANNAH telling MADLOCK

that law enforcement has just recovered some of his weapons and a stolen vehicle he was using. MADLOCK tells HANNAH that he should be able to continue to evade capture, since HANNAH did not have his name on any paperwork in the vehicle. MADLOCK also told HANNAH that if HANNAH had his VIN covered in the windshield, police wouldn't have known the previously referenced white Alfa Romero was stolen.

45. On or about June 18, 2024, HANNAH and MADLOCK had the following text conversation:

- HANNAH: You think you will be able to get the paper plate today or tomorrow or by Friday Saturday I'm tryna go to the dog show still
- MADLOCK: By today
- MADLOCK: And send that address you want for the normal plate to come to
- HANNAH: Bet and this mf brand new I pulled the stickers off the windows too
- MADLOCK: Blue Jeep grand Cherokee right ? What year again
- HANNAH: idek know the year it look newer
- HANNAH: 2020
- HANNAH: 3106 w greenfield avenue apt 115 Milwaukee wi 53215
- HANNAH: Blue Jeep grand Cherokee 2020
- …
- MADLOCK: Imma need a prepaid card with $8 on it to finish up the order
- MADLOCK: (provided a picture of the DMV website showing RICKEY MC KAY, 3406 W Greenfield Ave, #115)
- HANNAH: I got one
- MADLOCK: Bet Send info
- HANNAH: (Provided Credit card information)
- MADLOCK: (Provided a picture of a fictitious paper license plate)
- MADLOCK: I'll bring it to you tonight
- HANNAH: Say less my boy
- …
- MADLOCK: Slide by here and pick this temp up if you want I'll run out
- MADLOCK: I'm at d6 they got me inside today
- HANNAH: Ok bet

46. Investigators believe that this conversation reflects MADLOCK creating, at HANNAH's request, a fake temporary license plate which lists to a 2018 Blue Jeep Grand Cherokee. Investigators believe that MADLOCK utilizes law enforcement databases to find

temporary plates that match the stolen vehicle and creates a fake temporary plate to place on the vehicles. Later in the conversation, HANNAH provided a picture of the fake temporary plate on his presumably stolen Jeep Grand Cherokee and asked if it is valid. MADLOCK responded that he would be fine.

47. On or about July 26, 2024, HANNAH and MADLOCK had the following text conversation:

- MADLOCK: Drakkar and sleepy [rivals to BZF and HANNAH] talking plenty shit about stew and tee you saw that?
- HANNAH: We on the live now lol
- HANNAH: Dnt trip
- HANNAH: That's why they mans got sent up (Laughing emoji)
- MADLOCK: Lol ok ok. I'm surprised that nigga sleepy talking like that. He been tuff since he starting hanging with them niggas in Chicago (laughing emoji)
- HANNAH: Bro stg!!!!
- HANNAH: We all just said that
- MADLOCK: Let me know if you need that (map pin emoji and laughing emoji) [believed to be a reference to location information for "Drakkar and sleepy," rivals to BZF and HANNAH]
- HANNAH: Yes asap !
- HANNAH: He next stg tired of dude
- MADLOCK: You want Kracks [rival to BZF and HANNAH] too?
- HANNAH: Yep
- HANNAH: On my kids
- MADLOCK: (Provides address of 4240 N 47th St, Milwaukee WI for Kaekwuan E Walton) [believed to be "Kracks"]
- HANNAH: This ccap?
- MADLOCK: (Provided CCAP listing of 9736 W Capitol Dr, Milwaukee for Kaekwuan Walton) [believed to be "Kracks"]
- MADLOCK: This CCAP
- HANNAH: He sweet
- HANNAH: He probably dnt live there
- MADLOCK: The ccap on Capitol that other address not
- HANNAH: Which one new
- MADLOCK: They both from this year
- HANNAH: Okay wats Sleep shit
- HANNAH: idek his name
- HANNAH: Okay wats sleepy shit
- MADLOCK: Quinton Butler
- MADLOCK: And I'll get it tomorrow

- HANNAH: Oml that's his name lol
- MADLOCK: Yeah (Laughing emoji)
- HANNAH: He a bitch (laughing emoji) basketball ass nigga man
- MADLOCK: Them spots should be good for Kracks tho same with Drakkar
- MADLOCK: 4441 N 76th St
- HANNAH: (Sleeping emoji)
- MADLOCK: (smily face emoji) yea
- HANNAH: Bet
- MADLOCK: 2440 n Buffum st for (car emoji)
- HANNAH: Damn that boy got plenty
- HANNAH: lol so the 7300 ain't valid nomore ?
- MADLOCK: 7300 papers address
- MADLOCK: 9736 w capitol dr kracks
- HANNAH: Ok I got both of them
- HANNAH: 2440 n Buffum st… This new ?
- MADLOCK: He updated that on his driver license last month
- MADLOCK: So that might be his real address and 7300 probation address
- MADLOCK: Or the other way around but they both recent
- HANNAH: Bet
- HANNAH: 7300 dnt have a apartment number ?
- MADLOCK: Nope
- HANNAH: Ok
- MADLOCK: I gave you that one damn near 2 months ago I thought somebody would've checked it out already (Laughing emoji)
- HANNAH: Just now getting (multiple car emojis, laughing emoji)
- HANNAH: Wats crazy is everybody giving us that one stg
- MADLOCK: Which one? 7300?
- HANNAH: Yep that one
- HANNAH: My nigga who just got out even knew that one
- MADLOCK: Try Buffum then he probably where he feel safe. Of just have a female go in and check the mail boxes last name would be on it
- HANNAH: We ain't check nun yet but I believe them gone be the 2
- HANNAH: They just went through there it's apartment 7300
- MADLOCK: Yeah ik it's 4 apts. That's why I was saying send a female or somebody in there then look on the wall where they be putting the mail for the apts
- HANNAH: Might be his bm house lowkey
- HANNAH: All the bitches seem valid I peeped them out

48. Investigators believe that this conversation reflects HANNAH looking for addresses of BZF rivals for the purposes of shooting and possibly killing them. Investigators believe that MADLOCK knows why HANNAH wants the addresses (especially since MADLOCK

notes that one address MADLOCK provided is probably where the BZF rival "feel[s] safe") and utilized open-source databases and law enforcement databases to find addresses for these individuals.

49. On or about October 1, 2024, MADLOCK and HANNAH had the following text conversation:

- MADLOCK: Aye bro you still got that guy that do the ids?
- HANNAH: That was a lady in Texas
- MADLOCK: It's all bad?
- HANNAH: I gotta see if this bitch I used to fuck wit can tap me on but I dnt fuck wit the bitch nomore
- HANNAH: You need one ?
- MADLOCK: Yeah but with a specific name on it. To get the track cleared
- HANNAH: Yeah you pick the name for sure it's just yo face on the ID
- HANNAH: See I heard about this other girl doin it but I never got one for her I just seen her post and say it
- MADLOCK: Okay bet let me know asap
- HANNAH: She said $250 10 day turn around
- MADLOCK: Ok bet this the one here?
- HANNAH: Nope
- HANNAH: That's probably why it's a 10 day mine took around that time too
- ….
- HANNAH: You still need that id she said?
- MADLOCK: Yea I do
- HANNAH: Shit wat you want me to tell her she was waiting on a reply
- MADLOCK: She got any pics of her work?
- HANNAH: Yeah hold up
- HANNAH: (Sends a picture of a Fake ID with the name Dupree Burns)
- HANNAH: 480-939-8185
- HANNAH: Did you hit her about that ID
- MADLOCK: Yeah I did
- HANNAH: She get you together?

50. Investigators believe that this conversation reflects MADLOCK soliciting contact information for a person who can generate a fake identification card for him.

51. On or about January 22, 2025, MADLOCK and HANNAH had the following text conversation:

- HANNAH: Aye don't talk to Leef
- HANNAH: If he try to call you
- MADLOCK: lol what happened now?
- HANNAH: Nun just hold off on buddy lol
- HANNAH: Ik he gone try to hit you
- HANNAH: Bro they took pictures off his wall of us and took them with them
- MADLOCK: Damn
- MADLOCK: Yeah at like 3 I ain't know who number that was texting me
- HANNAH: Yeah bro this might be deeper then we think
- HANNAH: I mean bro gone get a bail and get bailed out for sure but damn
- MADLOCK: Ion know bro if he had them feds might pick it up
- HANNAH: cuz the switch?
- MADLOCK: These yo guys but you probably gotta start looking at everybody and pay attention. Did yall call and see where he at?
- HANNAH: He aint hit the County yet
- MADLOCK: Yall can call the districts and they'll say if he there or not
- …
- MADLOCK: Is the Feds getting involved?
- HANNAH: That's wat we tryna see
- …
- MADLOCK: I wonder who told
- HANNAH: Hit me asap
- HANNAH: We gotta feeling exactly who one is !! I'm tryna get his name
- MADLOCK: Who?
- HANNAH: Damn near call me wen you free
- HANNAH: It's a lot to txt

52. Investigators believe that this conversation reflects HANNAH reaching out to MADLOCK to see if he could utilize law enforcement databases to determine the identity of the informant working with law enforcement against BZF member Kwan Wilson (who was arrested after a search of his home, where law enforcement found a switch, drugs, and guns, *see* Milwaukee County Case No. 2025CF00430). MADLOCK and HANNAH also discuss the possibility that federal prosecution could follow ("Is the Feds getting involved?"), given the presence of "the switch."

53. The Subject Devices are currently in law enforcement's possession in the Eastern District of Wisconsin (physical devices are at HIDTA, 11548 W. Theodore Trecker Way, West

Allis, WI, while extractions are both at HIDTA and FBI-Milwaukee, 3600 S. Lake Dr., St. Francis, WI), such that good cause exists to permit law enforcement to perform this search at any time, day or night.

54. Law enforcement believes that the data requested here regarding the Target Cell Phone may help them locate MADLOCK and his device, which will in turn contain evidence probative of the Target Offenses.

**IV. Cell-Site Data**

55. In my training and experience, I have learned that AT&T is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

56. Based on my training and experience, I know that AT&T can collect cell-site data on a prospective basis about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the

cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as AT&T typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

**E-911 Phase II / GPS Location Data**

57. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I believe that AT&T can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on AT&T's network or with such other reference points as may be reasonably available.

**AUTHORIZATION REQUEST**

58. Based on the foregoing, I request that the Court issue the proposed warrants, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

59. I further request that the Court direct AT&T to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

60. I also request that the Court direct AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the Target Cell Phone on AT&T network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

61. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 120 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

62. Because the warrant will be served on AT&T, who will then compile the requested records at a time convenient to them, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

<u>**ATTACHMENT A**</u>

**Matter No. 2025R00071**

Records and information associated with the cellular device assigned call 414-510-8500 ("Target Cell Phone"), whose service provider is AT&T (the "Provider" or "Service Provider"), and whose suspected user is Juwon Jacquez MADLOCK.

**ATTACHMENT B**
**Matter No. 2025R00071**

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with Target Cell Phone for the time period February 1, 2022, to the date of this warrant:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

   viii. Means and source of payment for such service (including any credit card or bank account number) and billing records**;** and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by Target Cell Phone, including:

(i) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received); and

(iii) timing advance data (PCMD, RTT, True Call, Timing Advance, LOCDBOR, or equivalent).

b. Information associated with each communication to and from Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with Target Cell Phone.

c. Information about the location of Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, per call measurement data (PCMD), Timing Advance, True Call, RTT, LOCDBOR, or similar and real time cell site information for 30 days and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and

with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitute evidence of violations of 18 U.S.C. §§ 4 (misprision), 922(d) (transferring ammunition to a felon), 922(g) (possession of a firearm by a felon), 922(o) (possession of a machinegun), 1512(c)(2) (obstruction), and 2315 (sale or receipt of stolen goods).